### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| The Pension Plan of Lumber Employees Local 786 Retirement Fund, *et al.*, | |
| *Plaintiffs*, | No. 19 CV 7258 |
| v. | Judge Lindsay C. Jenkins |
| Charles Horn Lumber Company, *et al.*, | |
| *Defendants*. | |

### MEMORANDUM OPINION AND ORDER

Charles Horn Lumber Company ("CHLC") participated in the Pension Plan of Lumber Employees Local 786 Retirement Fund (the "Pension Fund") until May 31, 2017, when it withdrew, incurring withdrawal liability. After CHLC defaulted on its payments, the Pension Fund and its trustees (collectively, "Plaintiffs") initiated this suit to collect the outstanding withdrawal liability against CHLC and other entities and individuals the Pension Fund contends are obligated to pay the withdrawal liability. After some claims have settled, the remaining Defendants are CHLC, Norman Horn, Susan Horn, James Horn,[1] and Horn Brothers, LLC (collectively, "Defendants").[2] Plaintiffs move for summary judgment [Dkt. 173], arguing that Defendants are jointly and severally liable for the outstanding withdrawal liability. Norman also moves for summary judgment [Dkt. 176], arguing that he is not

---

[1] Hereafter, the Court refers to these individuals, as well as Jason Horn, by first name.

[2] Jason Horn is also a Defendant, but he and Plaintiffs report that they have reached a settlement, and they plan to file a stipulation of dismissal as to Jason once he satisfies his obligations under that agreement. [Dkt. 208.] In the interim, they ask the Court not to rule on Plaintiffs' motion with respect to Jason. [Dkt. 210.] Accordingly, Plaintiffs' motion is denied without prejudice to refiling with respect to Jason, and the Court does not discuss Plaintiffs' claims against Jason here.

personally liable. For the reasons stated below, Plaintiffs' motion is granted and Norman's motion is denied.

## I.     Local Rule 56.1

The Court first discusses Local Rule 56.1, which colors how the Court will present the facts. Along with their motions for summary judgment, Plaintiffs and Norman filed statements of material facts as required by Local Rule 56.1. [Dkt. 175, 178.] "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." Loc. R. 56.1(e)(3). Three Defendants did not respond to Plaintiffs' motion—CHLC, Horn Brothers, and James—so the Court deems Plaintiffs' facts admitted by those Defendants, provided that those facts are supported by evidence. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). Susan responded to Plaintiffs' Local Rule 56.1 statement, admitting most of the asserted facts but denying four paragraphs in full or in part [Dkt. 190 ¶¶ 9, 12, 20, 26.] But Susan did not "cite specific evidentiary material that controverts th[ose] fact[s]," so the Court deems those facts admitted too. Loc. R. 56.1(e)(3); *see Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 611 n.13 (7th Cir. 2023) (district court may require strict compliance with Local Rule 56.1).

Plaintiffs argue that Norman's Local Rule 56.1 response [Dkt. 193] and Susan's statement of additional material facts [Dkt. 190 at 13–14] violate Local Rule 56.1. As to Susan's statement, Plaintiffs argue that her affidavit [Dkt. 190-1] is not signed or notarized and the pages of her deposition transcript do not support the assertion that

she and Norman combined owned less than 80% of the Property. [Dkt. 196 at 3.] The Court agrees. "The affidavit is unsigned and thus unsworn, which deprives it of value as actual evidence," *United States v. Brown*, 779 F.3d 486, 494 (7th Cir. 2015) (citations omitted), and while the Court can consider evidence that is "admissible in content, such that … the substitution of oral testimony … would make the evidence admissible at trial," *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016) (citations omitted), her affidavit does not comply with the requirement that an affidavit "be made on personal knowledge … and show that the affiant or declarant is competent to testify on the matters stated," Fed. R. Civ. P. 56(c). [Dkt. 190-1.] While technical, these requirements are mandatory. *Toro Co. v. Krouse, Kern & Co., Inc.*, 827 F.2d 155, 162–63 & 162 n.3 (7th Cir. 1987); *see also USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 513 (7th Cir. 2022). Plaintiffs are also correct that the cited pages of Susan's deposition testimony do not support her and Norman owning less than 80% of the Property—those pages do not mention ownership shares at all. Thus, even where Susan has attempted to dispute Plaintiffs' statement of facts by citing specific evidence, she has failed to create a genuine dispute. As a result, all Plaintiffs' facts are deemed admitted against her. *Keeton*, 667 F.3d at 884.

Plaintiffs mount several objections to Norman's Local Rule 56.1 response. First, they argue that some "purported denials … violate the rule by not citing any evidentiary materials to support his denials, and therefore those statements should be deemed admitted as well." [Dkt. 196 at 4; *see also id.* at 5–6.] But most of the paragraphs in question contain objections based on mischaracterization of testimony

or a lack of supporting evidence, rather than factual disputes. The Court considers the facts in the light most favorable to Norman when ruling on Plaintiffs' motion, *see Frazier-Hill v. Chi. Transit Auth.*, 75 F.4th 797, 801 (7th Cir. 2023), so it will assess whether the support for the facts in question is flawed in the way that Norman contends it is. The one exception is paragraph 6, which in addition to an objection contains a factual denial but no citation to evidence, so the facts in paragraph 6 will be deemed admitted if they have evidentiary support. *Keeton*, 667 F.3d at 884.

Second, Plaintiffs argue that Norman's general objection based on Plaintiffs' alleged reliance on evidence that will not be admissible at trial is improper. [Dkt. 196 at 4–5.] The Court agrees. Blanket objections are disfavored, *see* Loc. R. 56.1(e)(2); *Stopka v. Am. Fam. Mut. Ins. Co., Inc.*, 2012 WL 2115495, at *1 (N.D. Ill. June 7, 2012), and because Norman does not explain which evidentiary material he thinks will not be admissible at trial, the Court cannot evaluate his argument. Perfunctory and undeveloped arguments are waived. *Hakim v. Safariland, LLC*, 79 F.4th 861, 872 (7th Cir. 2023); *see also Jeffers v. Comm'r*, 992 F.3d 649, 653 (7th Cir. 2021) ("Judges are not like pigs, hunting for truffles buried in briefs." (quotation omitted)).

Third, Plaintiffs ask the Court to disregard the responses to paragraphs 7, 11, 51, and 52 to the extent that they "purport to set forth new facts that were not previously part of the evidentiary record." [Dkt. 196 at 5.] They are correct that the proper place for new evidence is in a statement of additional facts, and this can be a basis for disregarding a party's filings. *See* Loc. R. 56.1(e)(2); *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643–44 (7th Cir. 2008). That said, the Court prefers to decide cases

4

on the merits, *see Atkins v. Gilbert*, 52 F.4th 359, 361 (7th Cir. 2022) (per curiam), and Norman did file a separate statement of additional facts, unlike in *Ciomber*, 527 F.3d at 644 ("Ciomber's response contained only lengthy recitations of additional facts in his responses to Cooperative Plus's statement of material facts." (cleaned up)). Norman appears to have tried in good faith to comply with Local Rule 56.1, and the Court will not penalize him if he strayed over the line in a few paragraphs. Of course, if Plaintiffs are correct that the new facts Norman cites are unresponsive to their asserted facts, there will be no genuine dispute about them. Loc. R. 56(e)(3).

## II.    Background

The Court now turns to the facts. Consistent with the discussion above, unless otherwise noted, the facts presented below are undisputed, or deemed admitted and supported by evidence.[3] Where Norman validly objects based on mischaracterization or lack of evidence, the Court recounts the facts in question as supported by the cited evidence but does not expressly discuss Norman's objections. The Court does address where Norman denies or disputes facts, except paragraph 6, as noted above.

### A.    Charles Horn Lumber Company

From the 1940s until 2013, CHLC operated out of 2440 South Damen Avenue in Chicago (the "Property"), when it moved to a location in Cicero. [Dkt. 188 ¶ 13; Dkt. 193 ¶¶ 3, 8–9; Dkt. 194-1 ¶ 2.] CHLC leased the Property from the Horn Realty Trust ("HR Trust"), of which various members of the Horn family were beneficiaries

---

[3]    For facts taken from Plaintiffs' statement of facts [Dkt. 175] and any responses, the Court cites Norman's response [Dkt. 193] because only he has disputed facts consistently with Local Rule 56.1's requirements.

over the years. [Dkt. 193 ¶¶ 5–6.] The HR Trust sold the Property to an unrelated third party on July 6, 2016; the purchase agreement was signed by Norman and Susan, who collectively had power of attorney for all beneficiaries. [*Id.* ¶ 10.] On May 31, 2017, CHLC ceased major business operations. [Dkt. 188 ¶ 32; Dkt. 193 ¶ 24.] It is undisputed that Susan, James, and Jason managed CHLC's business activities between December 2016 and when CHLC ceased operations on May 31, 2017. [Dkt. 193 ¶¶ 12, 24.] The parties dispute the nature and scope of Norman's role with CHLC. He retired from day-to-day business operations in 2008 but continued to have some involvement with the company until 2017. [Dkt. 188 ¶ 14; Dkt. 193 ¶ 13; Dkt. 198 ¶ 13.] Given how the Court resolves the motions, this dispute is immaterial.

### B. Horn Brothers, LLC

On September 15, 2016, James, Jason, and a third employee of CHLC formed Horn Brothers, LLC, "for the purpose of taking over CHLC's business, but without intending to assume the collective bargaining agreement [("CBA")] with the Union, CHLC's debts or CHLC's other legal obligations." [Dkt. 193 ¶¶ 25–26.] Horn Brothers operated out of the same Cicero location as CHLC; had the same address, phone number, and internet domain as CHLC; and had substantial overlap in employees, customers, and products with CHLC. [*Id.* ¶ 27.] After the CHLC lease of the Cicero property ended, Horn Brothers entered into a lease agreement with that property; it is disputed whether CHLC continued to operate from that property. [*Id.* ¶ 33.]

In early 2017, Jason took the lead on discussions to sell CHLC's assets to MacDonald & Owen ("M&O"), which provided the wood products CHLC sold. [*Id.* ¶ 29.] Susan and Norman were presented with sale documents as a *fait accompli*, and

6

CHLC agreed to sell its assets for $34,000 on May 31, 2017. [*Id.* ¶¶ 29–30; Dkt. 198 ¶ 10; *see* Dkt. 188 ¶ 39 (admitting that Norman was not involved in the negotiations).] The parties dispute some points about the sale, but these disputes are immaterial.

On May 30, 2017, Horn Brothers entered into a noncompete agreement with M&O, pursuant to which Horn Brothers would not compete against M&O and would act as its commissioned representative. [Dkt. 193 ¶ 34.] Days later, on June 6, 2017, Horn Brothers and M&O entered into a strategic alliance agreement with substantially similar terms to an earlier agreement between CHLC and M&O. [*Id.* ¶ 35; *see id.* ¶ 16.] On July 1, 2017, Horn Brothers and M&O formally agreed to allow Horn Brothers to continue using the former CHLC property, with an option for Horn Brothers to purchase the equipment from M&O. [*Id.* ¶ 36.] On December 28, 2018, Horn Brothers ceased doing business. [*Id.* ¶ 27.] That same day, Horn Brothers sold the CHLC/Horn Brothers business and assets for a total of over $267,000. [*Id.* ¶ 37.]

## C.    The Pension Fund

The Pension Fund is a multiemployer benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"). [*Id.* ¶ 1.] 29 U.S.C. §§ 1002(37), 1301(a)(3).[4] Under CBAs in force from 1986 to May 31, 2017, CHLC was required to make contributions to the Pension Fund. [Dkt. 193 ¶¶ 19, 21.] Susan handled negotiations with the union from December 2016 to June 2017, and she informed the union CHLC would not renew its contract. [*Id.* ¶¶ 20, 23.]

---

[4]    To be precise, the provisions at issue here are part of the Multiemployer Pension Plan Amendments Act of 1980, which amended ERISA. *See Cent. States Se. & Sw. Areas Pension Fund v. Messina Prods., LLC*, 706 F.3d 874, 877 (7th Cir. 2013). For ease of reference, the Court attributes the statutory provisions it discusses to ERISA generally.

As a result of terminating the CBA, CHLC became liable for withdrawal liability. On July 17, 2017, the Pension Fund notified CHLC by letter that CHLC had incurred a complete withdrawal and owed $279,231. [*Id.* ¶ 42.] The Pension Fund set forth a payment schedule under which CHLC would make quarterly payments beginning in September 2017. [*Id.*] Norman denies receiving correspondence sent to CHLC after his 2008 retirement but does not dispute that CHLC received notice. [*Id.*]

CHLC missed its first payment toward its withdrawal liability on September 15, 2017; the Pension Fund notified CHLC that it was in default on September 18, 2017 and that if it did not cure within 60 days, the entire withdrawal liability amount would immediately become due and owing. [*Id.* ¶ 43.] CHLC made a payment in October 2017, but it missed its next payment in November 2017. [*Id.* ¶¶ 44–45.] On December 29, 2017, the Pension Fund again notified CHLC regarding its delinquent withdrawal liability payment, and CHLC made a payment on February 7, 2018, but it made no further payments. [*Id.* ¶¶ 46–47.] On May 17, 2018, the Pension Fund notified CHLC that it was in default and failure to cure within 60 days would cause its entire withdrawal liability to become due immediately. [*Id.* ¶ 48.]

Plaintiffs assert that neither CHLC nor any member of CHLC's "controlled group" sought review of the Pension Plan's July 17, 2017 determination of CHLC's withdrawal liability within 90 days pursuant to 29 U.S.C. § 1399(b)(2)(A) or initiated arbitration under § 1401(a). [*Id.* ¶¶ 51–52.] Norman admits that he is unaware of any party initiating arbitration regarding CHLC's withdrawal liability [*id.* ¶ 52], Susan expressly admits these allegations [Dkt. 190 ¶¶ 51–52], and they are deemed

8

admitted as to the Defendants who failed to respond to Plaintiffs' motion for summary judgment.

### D. Procedural Posture

Plaintiffs and Norman have filed cross-motions for summary judgment. [Dkt. 173, 176.] Plaintiffs ask the Court to hold that Defendants are jointly and severally liable for CHLC's withdrawal liability, which they calculate as $340,731, plus interest and attorney's fees. *See* 29 U.S.C. §§ 1132(g)(2)(D), 1399(c)(5). Norman asks the Court to hold that he is not personally liable for CHLC's withdrawal liability.

## III. Legal Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Frazier-Hill*, 75 F.4th at 802. On cross-motions for summary judgment, the Court views the facts in the light most favorable to the party against whom the motion under consideration is made. *Frazier-Hill*, 75 F.4th at 802. A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022).

## IV. Analysis

Defendants' failure to arbitrate Plaintiffs' claims leave the Court little to do on the merits. As explained below, all relevant disputes here—including whether each individual Defendant was obligated to arbitrate his or her defenses—are subject to ERISA's mandatory arbitration scheme. Because Defendants did not arbitrate, they

9

have forfeited any defenses they could have raised. Therefore, Plaintiffs are entitled to summary judgment and Norman is not.

### A.    Statutory Framework

When an employer withdraws from a multiemployer pension plan, it becomes liable to the plan for withdrawal liability. 29 U.S.C. § 1381(a). The plan sponsor—here, the Pension Fund's trustees, § 1301(a)(10), whom the Court refers to as the plan or the Pension Fund for simplicity—determines the amount of the withdrawal liability and notifies the employer of that liability. § 1382(1)–(2); *Cent. States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371 (7th Cir. 1992). The employer pays its liability pursuant to an installment plan, but if the employer defaults on its payments and fails to cure within 60 days, the plan can demand immediate payment on the entire withdrawal liability. *See* § 1399(c)(1), (c)(5); *Nat'l Shopmen Pension Fund v. DISA Indus., Inc.*, 653 F.3d 573, 576 (7th Cir. 2011).

ERISA speaks of an "employer's" withdrawal liability, but it defines that term broadly. "Not only the withdrawing employer can be held liable. Congress also provided that all 'trades or businesses' under 'common control' with the withdrawing employer are treated as a single entity for purposes of assessing and collecting withdrawal liability." *Messina*, 706 F.3d at 878 (citation omitted) (quoting 29 U.S.C. § 1301(b)(1)). That is, all members of the "controlled group" are liable for the withdrawal liability. *See id.* at 880; *Slotky*, 956 F.2d at 1371–72.

If an employer—including a controlled group member—wishes to contest the plan's determinations, such as the amount of its withdrawal liability, the employer must notify the plan, § 1399(b)(2)(A), and if the dispute cannot be resolved informally,

it must be arbitrated, § 1401(a). If the employer fails to arbitrate, then the amount demanded by the plan becomes due and owing immediately, the plan can sue to collect, § 1401(b)(1); *Slotky*, 956 F.2d at 1371–72, and the employer forfeits defenses it could have raised in arbitration, *DISA Indus.*, 653 F.3d at 579. Issues subject to mandatory arbitration include whether a person who once was an employer within the meaning of § 1301(b)(1) is no longer an employer, but not whether a person has never been an employer. *See Banner Indus., Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 875 F.2d 1285, 1292–93 (7th Cir. 1989); *Slotky*, 956 F.2d at 1373.

## B. CHLC's Liability

CHLC's liability for the outstanding withdrawal liability is straightforward. By failing to respond to Plaintiffs' motion for summary judgment, CHLC admitted the following facts: It was an employer required to make contributions to the Pension Fund pursuant to CBAs in force until May 31, 2017. [Dkt. 175 ¶ 19.] After the last CBA was terminated, the Pension Fund notified CHLC that it had incurred a complete withdrawal and was obligated to make withdrawal liability payments. [*Id.* ¶ 42.] CHLC did not contest its liability with the Pension Fund pursuant to 29 U.S.C. § 1399(b)(2)(A) and did not initiate arbitration under § 1401(a). [*Id.* ¶¶ 51–52.] And on May 17, 2018, the Pension Fund notified CHLC that it was delinquent on its withdrawal liability payments, and CHLC failed to cure its default within 60 days. [*Id.* ¶¶ 47–48.] As a result of its failure to cure, CHLC's entire outstanding withdrawal liability became due and owing, § 1399(c)(5), and CHLC's failure to arbitrate forfeits its defenses in this proceeding, *see DISA Indus.*, 653 F.3d at 579. Plaintiffs are therefore entitled to summary judgment against CHLC.

11

## C.     Norman's and Susan's Liability

Plaintiffs argue that Norman and Susan are jointly and severally liable for CHLC's withdrawal liability because they are the owners of a general partnership in common control with CHLC. [Dkt. 185 at 9.] Norman argues that he cannot be held personally liable [Dkt. 177 at 2–8; Dkt. 192 at 4–11], but an antecedent question is whether he was subject to the mandatory arbitration provision. If so, then he has forfeited any defenses he could have raised in arbitration. § 1401(b)(1); *DISA Indus.*, 653 F.3d at 579; *Slotky*, 956 F.2d at 1371–72. While Norman argues that he was not a member of CHLC's controlled group at the time of the sale [*see* Dkt. 192 at 10 ("Norman … did not engage in any trade or business at the time of the alleged withdrawals.")], the relevant question is whether Norman was ever a member of the controlled group. An individual who once was a controlled group member but now claims not to be must arbitrate that issue, but an individual who argues he never was in the controlled group need not. *See Banner Indus.*, 875 F.2d at 1292–93; *Slotky*, 956 F.2d at 1373. Susan also argues that she was never a member of the controlled group [Dkt. 191 at 2–4], so the question as to both Norman and Susan is whether they were once members of CHLC's controlled group. The Court concludes that they were.

### 1.     Test for Controlled Group Membership

All "trades or businesses (whether or not incorporated) which are under common control shall be treated as … a single employer" for purposes of withdrawal liability. 29 U.S.C. § 1301(b)(1). The statute incorporates the definitions of these terms from regulations promulgated by the Secretary of the Treasury under 26 U.S.C. § 414(c). *See Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d

12

873, 880–81 (7th Cir. 2011). Organizations can be under common control through a parent-subsidiary relationship, a brother-sister relationship, or a combination of the two. 26 C.F.R. § 1.414(c)–2(a); *SCOFBP*, 668 F.3d at 880. Plaintiffs contend that the brother-sister relationship applies here.

> The term "brother-sister group of trades or businesses under common control" means two or more organizations conducting trades or businesses if (i) the same five or fewer persons who are individuals, estates, or trusts own … a controlling interest in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization.

§ 1.414(c)–2(c)(1). A "controlling interest" is defined as an 80% or greater ownership interest. § 1.414(c)–2(b)(2)(i); *SCOFPB*, 668 F.3d at 880–81. "Effective control" means more than 50% voting power for a corporation or more than 50% of the profit or capital interests for a partnership, counting controlled group members' interests only to the extent that they hold an interest in each organization. § 1.414(c)–2(c)(2)(i), (iii); *see Cent. States, Se. & Sw. Areas Pension Fund v. Ray C. Hughes, Inc.*, 2012 WL 1520721, at *2 (N.D. Ill. Apr. 30, 2012).

Neither ERISA nor the Treasury regulations defines "trade or business." *SCOFBP, LLC*, 668 F.3d 873, 880–81 (7th Cir. 2011); *see* 29 U.S.C. § 1301(b)(1). Adopting the test of *Commissioner v. Groetzinger*, 480 U.S. 23 (1987), the Seventh Circuit has held that "for economic activity to be considered the operation of a trade or business the activity must be performed (1) for the primary purpose of income or profit; and (2) with continuity and regularity." *Messina*, 706 F.3d at 878. Individuals can be liable as an employer if they "operat[e] as a 'trade or business,'" including "as commercial and residential landlords." *Id.* at 880.

13

Plaintiffs argue that CHLC and the Property were members of a controlled group through a brother-sister relationship under the common control of Norman and Susan. [Dkt. 185 at 9–10; Dkt. 196 at 7–9.] Since Plaintiffs argue that Norman and Susan together controlled these companies, the Court considers their interests together, as the Seventh Circuit did for a married couple in *Messina*, 706 F.3d at 880–84. *Messina* did not indicate that its analysis depended on the couple being married or mention marriage at all, and Norman and Susan have waived any argument that the analysis should be different here. *Cf. Bradley v. Village of University Park*, 59 F.4th 887, 897–98 (7th Cir. 2023). Thus, the Court will consider whether CHLC and the Property are (1) trades or businesses (2) that Norman and Susan have both a controlling interest in and effective control over. 26 C.F.R. § 1.414(c)–2(c)(1).

## 2. Trade or Business

There is no question that CHLC was a trade or business—it was a commercial enterprise that operated for the better part of a century. [Dkt. 193 ¶ 3.] Equally clear is that the Property was a trade or business, as the Seventh Circuit has held that "leasing property to a withdrawing employer itself is categorically a trade or business." *SCOFBP*, 668 F.3d at 979 (cleaned up). The Court does not address the implicit argument that the Property ceased to be a trade or business after it was sold. [*See* Dkt. 192 at 10.] It was once a trade or business, so if it was also under common control with CHLC, then it would be subject to the mandatory arbitration provision. *See Banner Indus.*, 875 F.2d at 1292–93; *Slotky*, 956 F.2d at 1373. Therefore, the dispositive question is whether CHLC and the Property were under common control.

### 3. Control over CHLC

CHLC's corporate tax returns list Norman, his son Bruce Scott Horn ("Bruce"), and the Steven C. Horn Family Trust ("Steven Horn Trust") as 100% owners due to the Treasury regulations' attribution provisions. [Dkt. 193 ¶ 11.] Norman acknowledges that the tax returns listed three 100% owners, but he argues that this was a mistake. [*Id.*] He contends that the true ownership interests were that he owned 25%, Bruce owned 25%, and Susan (through the Steven Horn Trust) owned 50%. [*Id.*; *see id.* ¶ 7.]

This is not a genuine dispute that precludes summary judgment. Norman makes no argument and cites no authority for his position [*see* Dkt. 192], so he has waived any counterargument he could have made about the proper application of the attribution provisions. *Cf. Bradley*, 59 F.4th at 897–99. Further, the only evidence Norman cites is his and Susan's deposition testimony [Dkt. 193 ¶ 11 (citing Dkt. 175-1 at 88–89; Dkt. 175-2 at 33–34)], but he has not established that he or Susan is qualified to opine about the operation of treasury regulations, a legal question. *See Pfiel v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985) ("Because legal argumentation is an expression of legal opinion and is not a recitation of a 'fact' to which an affiant is competent to testify, legal argument in an affidavit may be disregarded." (citation omitted)); *cf. Wash. Cnty. Water Co. v. Village of Sparta*, 77 F.4th 519, 529 (7th Cir. 2023) (holding that a water company CEO's opinion that the company could buy more water was inadmissible hearsay and could not be considered at summary judgment). Therefore, Norman has failed to create a genuine dispute about whether he and the Steven Horn Trust should be deemed 100% owners of CHLC.

15

The Steven Horn Trust's ownership interest also means Susan is a 100% owner of CHLC because the trust's interest is attributable to her. Under 26 C.F.R. § 1.414(c)–4(b)(3), an interest in a trust

> shall be considered owed by any beneficiary … who has an actuarial interest of 5 percent or more …, to the extent of such actuarial interest. … [T]he actuarial interest of each beneficiary shall be determined by assuming the maximum exercise of discretion by the fiduciary in favor of such beneficiary and the maximum use of the organization interest to satisfy the beneficiary's rights.

Susan is both a trustee and the primary beneficiary of the Steven Horn Trust, and Plaintiffs argue that she is attributed 100% of the trust's interest. [Dkt. 190 at 2–3, 11 n.3; Dkt. 196 at 8; *see* Dkt. 193 ¶ 7.] Susan does not dispute her status as a trustee and beneficiary of the Steven Horn Trust or argue that she should be attributed less than 100% of the trust's interest. [*See* Dkt. 191 at 2–4.] Since the trust's interest is attributed to Susan, she too is considered a 100% owner of CHLC, as reflected in the tax returns. [Dkt. 196.] Therefore, Norman and Susan have a controlling interest in CHLC because together they own at least 80% of the voting shares. [*Id.*]

### 4.  Control over the Property

The Property's ownership structure is more complex. It was sold on July 6, 2016 by the HR Trust, and at the time the undisputed beneficiaries were: Steven Horn Trust, 25%; Karen Radys, 25%; Norman, 16.67%; Richard Horn ("Richard"), 11%; Phyllis Sterling, 11%. [Dkt. 193 ¶ 10.][5] As discussed above, the Steven Horn

---

[5]    These numbers do not sum to 100%. Plaintiffs assert that Richard, Sterling, and the HR Trust owned 11.11% each. [Dkt. 193 ¶ 10.] Plaintiffs rely on Norman's deposition testimony, but as Norman points out, the pages they cite do not fully support those numbers. [*Id.*; *see* Dkt. 175-1 at 29–32.] While Plaintiffs' submitted numbers are logical, the Court must

Trust's interest is attributable to Susan. *See* 26 C.F.R. § 1.414(c)–4(b)(3). Plaintiffs argue that because only Norman and Susan signed the sales agreement and they had power of attorney for the other beneficiaries (Norman for Radys, Susan for Richard and Sterling), Radys's interest is attributed to Norman and Richard's and Sterling's to Susan. [Dkt. 185 at 9–10 ("Norman and Susan had effective control … and would be attributed the ownership of the non-controlling family members."); Dkt. 196 at 8; *see* Dkt. 193 ¶ 5.]

Susan contends that "[h]aving a limited power of attorney to sign sales documents is not the type of control of an entity required for the attribution rule to apply as Plaintiffs argue." [Dkt. 191 at 3–4.] But Susan cites no authority for this argument, and the only evidence regarding the nature of her power of attorney is the unsworn affidavit that must be disregarded. [*See id.* (citing Dkt. 190 ¶ 10 & pp. 13–14).] While Plaintiffs could have done a better job explaining how a power of attorney interacts with the attribution provisions, the Court concludes that their contention has support in the regulations, which generally attribute interests in organizations based on voting or discretionary power. *See* 26 C.F.R. §§ 1.414(c)–2(b)(2), 1.414(c)–4(b)(3); *see also SCOFPB*, 668 F.3d at 876 (explaining that the provisions at issue here "contain[ ] broad provisions that pierce the usual legal barriers between affiliated but legally distinct businesses"). If there is a superior way to understand these regulations, Norman has waived his right to convince the Court by failing to

---

draw inferences in Norman's favor while evaluating their motion for summary judgment. *Frazier-Hill*, 75 F.4th at 802. Therefore, the Court has used the numbers that Norman acknowledged in his deposition.

argue this point, *Bradley*, 59 F.4th at 897–98, and Susan's perfunctory argument also constitutes waiver, *Hakim*, 79 F.4th at 872. Thus, the Court will attribute to Norman and Susan the interests for which they held powers of attorney.

Applying the attribution guidelines to the undisputed ownership interests in the Property yields the following beneficial interests:

| Beneficiary | Interest | Attributed To |
|---|---|---|
| Steven Horn Trust | 25% | Susan |
| Richard | 11% | Susan |
| Sterling | 11% | Susan |
| Radys | 25% | Norman |
| Norman | 16.67% | Norman |

That makes Susan's interest at least 47% and Norman's at least 41.67%, for a total of over 80%, a controlling interest in the Property. *See* 26 C.F.R. § 1.414(c)–2(b)(2)(B).

### 5. Common Control

As explained above, Norman and Susan held controlling interests in both CHLC and the Property because they owned over 80% in each company. The next step is to determine whether they also had effective control over both companies. To answer that question, the Court asks whether the smaller of Norman's interest in both companies plus the smaller of Susan's interests sums to more than 50% of the voting power of CHLC and more than 50% of the profit or capital interests of the Property. *See* § 1.414(c)–2(c)(2); *Ray C. Hughes*, 2012 WL 1520721, at *2. Norman and Susan each owned 100% of CHLC, so their smaller interests are in the Property, of which Norman held at least 41.67% and Susan held at least 47%. The sum of those figures easily exceeds 50%, so Norman and Susan were in effective control of both companies. In conclusion, as of July 6, 2016, when the Property was sold, CHLC and

18

the Property were trades or businesses under the common control of Norman and Susan. 29 U.S.C. § 1301(b)(1); *see Messina*, 706 F.3d at 878.

### 6. Implications for Norman and Susan Personally

The above analysis has determined that the Property is an "employer" within the meaning of 29 U.S.C. § 1301(b)(1), so it is liable for CHLC's withdrawal liability. *Messina*, 706 F.3d at 878. But Plaintiffs seek to hold Norman and Susan personally liable, which requires another step in the analysis. They argue that *Messina* holds that general partners' liability follows from the partnership's liability [Dkt. 185 at 11], but *Messina* did not purport to establish a rule that general partners' liability automatically follows—the Seventh Circuit did not use the term "general partner" at all. Instead, *Messina* analyzed whether the individuals could be liable under the statutory scheme. *See* 706 F.3d at 880–84. The Court will do the same here.

In *Messina*, the pension fund argued that the Messinas themselves were engaged in a trade or business and were under common control with the withdrawing employer. *Id.* at 880. Here, Norman and Susan are separated from the Property's business by the HR Trust, which held the Property, but the intermediary trust does not impact the outcome. As explained above, Norman and Susan are deemed to have owned at least a combined 87.67% interest in the Property, *see* 26 C.F.R. § 1.414(c)–4(b)(3), and as partners in the Property, they are likewise attributed any interest held by the Property, here the interest in renting to CHLC, *see* § 1.414(c)–4(b)(2). Thus, Norman and Susan were under common control with CHLC and because they (through attributed ownership) leased the Property to CHLC, Norman and Susan also were engaged in a trade or business. *Messina*, 706 F.3d at 880–84.

As a result, Norman and Susan were an "employer" as of July 6, 2016 and in that capacity were subject to ERISA's mandatory arbitration provision and liable for CHLC's withdrawal liability. *Id.* at 878. Because they were once required to arbitrate, even if they were not an "employer" as of the date of the default, Norman and Susan were required to arbitrate that question. *See Banner Indus.*, 875 F.2d at 1292–93; *Slotky*, 956 F.2d at 1373. But Norman and Susan did not arbitrate, so they waived any argument they could have raised against holding them liable, *DISA Indus.*, 653 F.3d at 579, including that they were no longer employers within the meaning of the statute when CHLC withdrew, *Banner Indus.*, 875 F.2d at 1292–93. Thus, the Court need not address the parties' other arguments about Norman's and Susan's liability. Plaintiffs are entitled to summary judgment, and Norman's motion for summary judgment necessarily fails. *See Frazier-Hill*, 75 F.4th at 802.

### D. Horn Brothers' and James's Liability

Finally, Plaintiffs contend that Horn Brothers and James are liable for CHLC's withdrawal liability because of the transfer of CHLC's property to Horn Brothers. It is undisputed that Horn Brothers was formed on September 15, 2016 by James (with Jason and a third CHLC employee) "for the purpose of taking over CHLC's business, but without intending to assume the collective bargaining agreement with the Union, CHLC's debts, or CHLC's legal obligations," and there was considerable overlap between Horn Brothers and CHLC. [Dkt. 193 ¶¶ 25–27.] Plaintiffs argue that the transfer of CHLC's assets was designed to "evade or avoid" withdrawal liability, so the transfer must be ignored when determining withdrawal liability. [Dkt. 185 at 11–12.] *See* 29 U.S.C. § 1392(c); *Banner Indus.*, 875 F.2d at 1288. That determination is

arbitrable, but neither Horn Brothers nor James sought arbitration or argued that they were not subject to mandatory arbitration. *See Chi. Truck Drivers v. El Paso Co.*, 525 F.3d 591, 597 (7th Cir. 2008); *Banner Indus.*, 875 F.2d at 1288. Thus, Plaintiffs' determination controls, and they are entitled to summary judgment against Horn Brothers and James. The Court does not reach Plaintiffs' alternative arguments.

## V.     Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment [Dkt. 173] is granted as to CHLC, Horn Brothers, Norman, Susan, and James; as to Jason, the motion is denied without prejudice. Norman's cross-motion for summary judgment [Dkt. 176] is denied. Defendants CHLC, Horn Brothers, Norman, Susan, and James are jointly and severally liable for CHCL's outstanding withdrawal liability of $340,731; "accrued interest on the total outstanding liability from the due date of the first payment which was not timely made," 29 U.S.C. § 1399(c)(5); and reasonable attorney's fees in an amount to be determined later, 29 U.S.C. § 1132(g)(2)(D). Judgment shall enter in favor of Plaintiffs and against Defendants CHLC, Horn Brothers, Norman Horn, Susan Horn, and James Horn. This Order resolves all claims against these Defendants, but similar claims remain pending against Jason, so the Court will not enter final judgment as to these Defendants. *See* Fed. R. Civ. P. 54(b).

Enter: 19-cv-7258
Date:  November 28, 2023

_____
Lindsay C. Jenkins
United States District Judge